# **<u>EXHIBIT 1</u>**

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT |
| | ) *SS:* | |
| COUNTY OF MARION | ) | CAUSE NO.: |

|  |  |
|---|---|
| JENNIFER FINNERTY, individually, | ) |
| and as Personal Representative of the | ) |
| ESTATE OF CULLEN FINNERTY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| NATIONAL COLLEGIATE ATHLETIC | ) |
| ASSOCATION, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jennifer Finnerty, individually and as Personal Representative of the Estate of Cullen Finnerty, brings this Complaint and Demand for Jury Trial against Defendant National Collegiate Athletic Association, to obtain redress for Cullen Finnerty, who was injured and who ultimately died as a result of Defendant's reckless disregard for his health and safety as a student-athlete at the University of Toledo and Grand Valley State University. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## PARTIES

1.  Plaintiff Jennifer Finnerty brings this action on behalf of the Estate of Cullen Finnerty, as Personal Representative of the Estate. Jennifer is a resident of the State of Michigan, and Cullen Finnerty was domiciled in the State of Michigan when he died.

2.  Defendant National Collegiate Athletic Association is an unincorporated association with its principal place of business located at 700 West Washington Street, Indianapolis, Indiana 46206. The NCAA is not organized under the laws of any State but is

registered as a tax-exempt organization with the Internal Revenue Service. It is an unincorporated organization.

## JURISDICTION AND VENUE

3.      Venue is proper in Marion County because Defendant NCAA has its principal place of business in Marion County, located at 700 West Washington Street, Indianapolis, Indiana 46206.

4.      As the NCAA has admitted in prior court proceedings, it is not a corporation, but rather, an unincorporated association whose citizenship is determined by looking to the citizenship of each and all of its members.

5.      Because the NCAA has numerous members in Indiana (as well as in all other states), it is deemed to be a citizen of Indiana. Therefore, diversity jurisdiction is lacking.

## FACTUAL BACKGROUND

### I.      The NCAA Had a Duty to Protect Cullen Finnerty.

6.      The NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including in the football programs at the University of Toledo and Grand Valley State University. According to the NCAA, "[m]ore than 1,200 schools, conferences and affiliate organizations collectively invest in improving the experiences of athletes – on the field, in the classroom, and in life."

7.      The NCAA brings in more than $750 million in revenue each year, and is the most significant college sports-governing body in the United States.

8.      To accommodate the wide spectrum of athletes at its member schools, the NCAA has three different divisions of intercollegiate competition.

9.      Each NCAA Division is composed of several "conferences" to facilitate regional

league play.

10.    The University of Toledo has a Division I football program in the Mid-American Conference, of which it has been a member since 1950.

11.    Grand Valley State University has a Division II football program in the Great Lakes Intercollegiate Athletic Conference. Grand Valley State University Football has a long and storied history, including appearances in six NCAA Division II national Title Games, and four Division II National Championships since 2002, including three with Mr. Finnerty as starting quarterback.

12.    The NCAA plays a significant role in governing and regulating the football programs at the University of Toledo and Grand Valley State University and owes a duty of care to safeguarding the well-being of its athletes.

13.    In fact, since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[1] The IAAUS was specifically formed for this purpose because, at the turn of the twentieth century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. After several subsequent meetings of colleges, the NCAA was established.[2] As such, the genesis of the NCAA was for a singular goal: "to keep college athletes safe."[3]

---

[1]    *Who We Are*, National Collegiate Athletic Association, http://www.ncaa.org/about/who-we-are (last visited August 27, 2018).

[2]    In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

[3]    *Well-Being*, National Collegiate Athletic Association, http://www.ncaa.org/health-and-safety (last visited August 8, 2018)

14.     According to the NCAA, "[c]ollege and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletic administrators, faculty and student-athlete representatives [while each] division creates its own rules that follow the overarching principles of the NCAA."[4]

15.     The overarching principles of the NCAA, including its purported commitment to safeguarding its athletes, are contained in the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and athletes. The NCAA Constitution states:

> The purposes of this Association are:
>
> (a)  To initiate, stimulate and improve intercollegiate athletics programs for athletes;
>
> (b)  To uphold the principal of *institutional control* of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b) (emphasis added).

16.     The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

17.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

> **2.2 The Principle of Student-Athlete Well-Being.**
>
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-

---

[4]     Membership, *National Collegiate Athletic Association*, http://www.ncaa.org/about/who-we-are/membership (last visited August 27, 2018).

being of student athletes. (Revised: 11/21/05.)

**2.2.3 Health and Safety.**

It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

18.     To accomplish this purpose, the NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. NCAA member institutions are required to abide by the NCAA rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, § 2.8.1.

19.     The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."[5]

20.     The NCAA, therefore, holds itself out as both a proponent of and authority on the

---

[5]     *See, e.g.*, David Klossner, *2013-14 NCAA Sports Medicine Handbook*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Aug. 2013), *available at* https://www.on.ncaa.com/2oEfOsq.

treatment and prevention of sports-related injuries upon which NCAA athletes, the University of Toledo, Grand Valley State University, and all other member institutions can rely for guidance on player-safety issues.

21.     This has been the case since, at minimum, the time Mr. Finnerty played football at the University of Toledo and Grand Valley State University.

22.     Mr. Finnerty relied upon the NCAA's authority and guidance to protect his health and safety by treating and preventing head-related injuries, including the effects of those head injuries later on in his life.

23.     As compared to Mr. Finnerty, the NCAA was in a superior position to know of and mitigate the risks of him sustaining concussions and other TBIs while playing football at the University of Toledo and Grand Valley State University. It failed to do so.

## II.     Decades of Studies Firmly Establish the Dangers of Football-Related Concussions.

24.     Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions and TBIs, with a heightened risk of long-term injuries and impacts, including memory loss, dementia, depression, Alzheimer's disease, Parkinson's disease, chronic traumatic encephalopathy ("CTE"), and other related symptoms.

25.     Such violent impacts to the head are a one-way street for those who experience them. As Jonathan J. Russin—assistant surgical director of the USC Neurorestoration Center at the Keck School of Medicine—has stated, "there's no way to undo a traumatic brain injury," and one's "best bet is to avoid concussions altogether."[6]

---

[6]      Deanna Pai, *Do Concussions Increase the Risk of Stroke or Brain Cancer?*, Keck School of Medicine at USC, https://bit.ly/2MzSkkC (last visited August 8, 2018).

26.    To better understand the results of these studies, a brief introduction to concussions in football follows.

    *A.*    An Overview of Concussions in Football.

27.    A TBI is an injury to the brain that comes as the result of the application of either external physical force or rapid acceleration and deceleration forces, which disrupts brain function in a manner that causes impairments in cognitive and/or physical function.

28.    A concussion is a TBI initiated by an impact to the head, which causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist within the skull, damaging brain cells and leading to harmful chemical changes in the brain.

29.    The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the skull. But relatively minor impacts—including not only direct blows to the head, but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

30.    Concussions typically occur when linear and rotational accelerations impact the brain through either direct impacts to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown athletes can receive more than 1,000 impacts greater than 10 Gs (or gravitational) force. This is slightly more force than a fighter pilot receives doing maximal maneuvers. The majority of football-related hits to the head exceed 20 Gs, with some going well over 100 Gs.

31.    Kevin Guskiewicz of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine college football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't

wearing your seat belt, the force of your head hitting the windshield would be around 100 [Gs]: in effect, the player [who sustained two hits above 80 Gs] had two car accidents that morning."[7]

        i.    *Concussion Symptoms.*

32.    When a collegiate athlete suffers a severe impact to the head, he may experience concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;
- memory loss, such as trouble remembering things that happened right before and after the injury;
- nausea or vomiting;
- headaches;
- blurred vision and sensitivity to light;
- slurred speech or saying things that do not make sense;
- difficulty concentrating, thinking, or making decisions;
- difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);
- feeling anxious or irritable for no apparent reason; or
- feeling overly tired.

33.    A collegiate athlete may not recognize the signs and/or symptoms of a concussion, and, more often, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

        ii.    *Post-Concussion Treatment.*

34.    After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is

---

[7]    Malcolm Gladwell, Offensive Play, *The New Yorker* (October 19, 2009) http://www.newyorker.com/magazine/2009/10/19/offensive-play (last visited August 8, 2018).

particularly vulnerable to further injury.

35.     The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

36.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months, or, sometimes, even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

37.     Still, many people think of concussions as short-term, temporary injuries. However, decades of scientific research demonstrate the effects of concussions are anything but temporary.

   *B.*  <u>Studies Confirm the Dangers and Long-Term Effects of Concussions</u>.

38.     Two of the leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called the tau protein.

39.     Between 2002 and 2007, Dr. Bennett Omalu of the Brain Injury Research Institute examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelczyk, and Damien Nash. Waters killed himself; Nash died unexpectedly at the age of 24; Webster, homeless and cognitively impaired, died of heart failure; and Strzelczyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristics of CTE—a progressive, degenerative disease of the brain found in people with a history of repetitive brain trauma.

40.     In his early studies, Dr. Robert Cantu of the Boston University Center for the Study of Traumatic Encephalopathy found evidence of CTE in 90 of 94 (96%) autopsied brains of former NFL players. A recent update to these studies found CTE in a staggering 110 of 111 (99%) former NFL players and 48 of 53 former college players (91%).[8]

41.     These more recent studies were neither aberrations nor surprises but confirmations of what was already known or readily apparent from the existing medical literature.

42.     Studies like these, which establish the devastating dangers related to TBIs, date back to the early twentieth century. For example, in an article in the 1905 multi-volume medical text, *A System of Medicine*, Surgeon Sir William Bennett noted that the dangers from TBIs can arise just as easily when "no loss of consciousness occurs at all," and that such injuries "may in the end have far graver results" due to their "escap[ing] treatment altogether in the first instance" given their less severe appearance.[9] Bennett noted that the imposition of a strict treatment regimen immediately after an injury, during initial recovery, and following the initial recovery period, was essential to the "treatment of all cases of concussion of the brain, whether they be severe or slight."

43.     Some early articles from this period even began to recognize the unique dangers presented by football. The editors of the *Journal of the American Association* recognized the long-term risks posed by such head injuries, particularly in football, very early on, writing in 1905 that "[t]o be a cripple or lunatic for life is paying high for athletic emulation" via football.[10] Similarly, the risks of concussion in football were discussed in a 1906 article by Dr. Edward Nichols, who

---

[8]     Jesse Mez, MD, MS, et al., *Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of American Football*, 318 JAMA 4, 360-370 (2017).

[9]     Sir William Bennett, *Some Milder Forms of Concussion of the Brain*, in A System of Medicine Vol. 8 231-32 (2d ed. 1910).

[10]     Editors, *The Football Mortality*, 39 JAMA 1464 (1905).

observed that a concussed player might go through multiple plays before his teammates noticed his altered mental state.[11]

44.     Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science began to clearly recognize the debilitating effects of concussions and other TBIs, connect it to contact sports, and find that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

45.     For instance, in 1927, Drs. Michael Osnato and Vincent Giliberti discussed a disease they called traumatic encephalitis in an article on post-concussion damage in *Archives of Neurology & Psychiatry*, concluding that brain disease could manifest in "young men knocked out in football and other games," but noting that the issue had "not received adequate attention."[12] Then, In 1928, Pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head.[13]

46.     Countless studies were later conducted on boxers suffering chronic neurological damage as a result of repeated head injuries, and who displayed signs of dementia and impairment of motor function.[14] As incidents of chronic encephalopathy increased, they were often

---

[11]     Edward Nichols, *The Physical Aspect of American Football*, 154 Boston Med. & Surgical J.1 (1906).

[12]     Michael Osnato & Vincent Giliberti, *Postconcussion Neurosis-Traumatic Encephalitis*, 18 Archives of Neurology & Psychiatry 181 (1927).

[13]     Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

[14]     *See*, *e.g*., E. Guttmann & C.E. Winterstein, *Disturbances of Consciousness After Head Injuries: Observations on Boxers*, 84 J. of Mental Sci. 347 (Mar. 1938); Harry L. Parker, *Traumatic Encephalopathy ('Punch Drunk') of Professional Pugilists*, 15 J. of Neurology &

characterized as a "Parkinsonian" pattern of progressive decline. However, in a 1940 publication on brain injuries, Psychiatrists Karl M. Bowman and Abram Blau coined the term "chronic traumatic encephalopathy" to explain the deterioration of a boxer's mental state over time.[15] That year, more than a decade after Dr. Martland's 1928 study, the American Football Coaches Association first published a report warning that players who suffer concussions should be removed from play.[16]

47.     In 1952, an article published in *The New England Journal of Medicine* first recommended a "three-strike rule" for concussions in football, demanding that players cease to play football permanently after receiving their third concussion.[17]

48.     Starting in the late 1960's, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. John R. Hughes and D. Eugene Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs").[18] Several years after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling the skull cannot accommodate.

---

Psychopathology 20 (July 1934); C.E. Winterstein, *Head Injuries Attributable to Boxing*, 2 Lancet 719 (Sept. 1937).

[15]     K.M. Bowman & A. Blau, *Psychotic States Following Head and Brain Injury in Adults and Children*, in Injuries of the Skull, Brain and Spinal Cord: Neuropsychiatric, Surgical, and Medico-Legal Aspects 309 (S. Brock, ed. 1940).

[16]     Proceedings of the Seventeenth Annual Meeting of the American Football Coaches Association (Dec. 29, 1937) ("Sports demanding personal contact should be eliminated after an individual has suffered a concussion").

[17]     Augustus Thorndike, *Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation*, 247 New Eng. J. Med. 554, 555-56 (1952).

[18]     John R. Hughes & D. Eugene Hendrix, *Telemetered EEG From A Football Player In Action*, 24 Electroencephalography & Clin. Neurophysiology 183 (1968).

49.     In 1975, the Chief Medical Officer of the British Boxing Board of Control suggested boxers were not the only persons or athletes vulnerable to the risk of long-term brain injuries, stating:

> Irreversible brain damage caused by regular excessive punching can cause a boxer to become punch drunk, a condition known euphemistically in medical terms as [Chronic] Traumatic Encephalopathy. The condition can be caused by other hazards of contact sports—taking too many falls while hunting or steep chasing or the continual use of brute force rather than skill in the rugby field or heading a football incessantly over many years. **Anything which entails intermittent trauma to the head can cause it.**[19]

50.     Overall, countless studies—published in prominent medical journals, including the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*—warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;
- encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;
- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) brainstem;
- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;
- immediate retrograde memory issues occur following concussions;
- head injury requires recovery time without risk of subjection to further injury;
- a football player who suffers a concussion requires significant rest before being subjected to further contact; and
- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

---

[19]     J.W. Graham, Eight, Nine, Out! Fifty Years as Boxer's Doctor, 56 (1975).

51.     As a result of these studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

52.     By 1991, Dr. Robert Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained head injuries.

53.     In 2003, an NCAA concussion study concluded that football players who had previously sustained a concussion were more likely to have future concussion injuries. Another 2003 NCAA concussion study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks."[20]

54.     Following these studies, in 2004, the National Athletic Trainers' Association published a position statement, recommending baseline cognitive and postural-stability testing, as well as return-to-play recommendations, including holding out athletes who exhibit symptoms of a suspected head injury.

55.     Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play symptomatic, and coined the phrase, "when in doubt, sit them out."

---

[20]     Michael McCrea, *et al.*, Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study, *The Journal of the American Medical Association* (November 19, 2003), *available at* http://jama.jamanetwork.com/article.aspx?articleid=197668.

56. Ultimately, while the NCAA knew of the harmful effects of TBI on athletes for decades, they ignored these facts and failed to institute any meaningful methods of warning and/or protecting the athletes, including the football players. For the NCAA, the continued expansion and operation of college football was simply too profitable to put at risk.

### III. The NCAA Breached Its Duties to Cullen Finnerty by Ignoring the Dangers of Concussions and Failing to Implement Adequate Concussion Management Protocols.

57. For decades, the NCAA has been aware—through its own institutional knowledge, medical science, and news articles about former football players—that severe head impacts can lead to long-term brain injury, including memory loss, dementia, depression, and CTE. Unfortunately, while the NCAA knew about the harmful and devastating effects of these sub-concussive and concussive injuries, it recklessly ignored these facts and failed to implement reasonable concussion management protocols to protect its athletes, including Cullen Finnerty.

58. In fact, on information and belief, throughout the second half of the twentieth century (and well into the twenty-first century), the NCAA was advised, by physicians and researchers, of the severe risks associated with playing football and incurring TBIs.

59. Since at least 1933, the NCAA has known of the serious nature of concussions and even recognized the need for appropriate concussion management protocols. In its 1933 Sports Medicine Handbook—which it distributed to all member institutions, including the University of Toledo and Grand Valley State University—the NCAA specifically recognized that head injuries warrant special attention and should not be regarded lightly.

60. The 1933 Sports Medicine Handbook then provided information for school and college doctors, coaches, and trainers to identify the signs and symptoms of concussions, as well as methods to be used on the sidelines for treating them. Notably, the 1933 Sports Medicine

15

Handbook recommended that, when concussion-related symptoms lasted longer than two days, players should "not be permitted to compete for 21 days or longer, if at all." It also stated, "[t]here is definitely a condition described as 'punch drunk' and often recurrent concussion cases in football and boxing demonstrate this," and that "[a]ny individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport."

61.     The NCAA recognizes that its Sports Medicine Handbook "may constitute some evidence of the legal standard of care." Indeed, the NCAA has publicly recognized its duty and moral obligation to protect collegiate athletes. As NCAA President Mark Emmert testified to the Senate Commerce Committee in January 2014, "I will unequivocally state we have a clear moral obligation to make sure we do everything we can to protect and support student-athletes."

62.     Indeed, in the September 1968 issue of NCAA News, the NCAA published an article entitled *Dangers of Grid Head Injuries Cited by Safeguards Committee.* In the article, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sport issued a statement on the dangers of repeated head injuries in football, stating:

> **[T]hose individuals who have been rendered unconscious, even momentarily, in a given game should never be allowed to play again in the same game and not allowed to return to contact until all symptoms have cleared up entirely and he has been checked by a competent medical authority.** In the area of the head and neck being super cautious is the only route to follow.
>
> It would be hoped that this type of situation would never occur, but often, due to pressure from enthusiastic players, parents, coaches, alumni, and even enthusiastic and well-meaning physicians, boys who should not be playing are allowed to play. Needless to say, we all want the athlete to compete as safely as possible and it is in this interest which prompted the Committee to call attention to this very important aspect of health care.

63.     Rather than inform Mr. Finnerty (and other athletes at the University of Toledo and Grand Valley State University) of these risks or implement protocols to protect and safeguard him

from TBI-related injuries (as the NCAA promised to do through the NCAA Constitution, among other things), the NCAA failed to meaningfully adopt or enforce the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

64.     Instead, in complete disregard of the vast body of known scientific evidence and the resources and authority that it possessed, the NCAA failed prior to 2010 to, amongst other things, do any of the following:

- implement adequate guidelines or rules to prevent repeated concussions and failed to educate players, including Mr. Finnerty, about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football;

- recommend or enforce return to play procedures or take adequate action to educate athletes, including Mr. Finnerty, about the risks of repetitive head injuries;

- conduct a football program that proactively encouraged Mr. Finnerty and other football players at the University of Toledo and Grand Valley State University to avoid head injuries, instead compelling Mr. Finnerty and others to ignore concussion symptoms and continue to play football within moments of experiencing concussion symptoms.

- contact football players after they left the University of Toledo and/or Grand Valley State University to inform them that they had been exposed to an increased risk of long-term brain damage by the sub-concussive and concussive blows sustained while playing football for their respective school.

65.     It was also not until April 2010, under mounting public pressure, that the NCAA made changes to its concussion treatment protocols, this time enacting a new policy that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

66.     Under that new policy, member schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion

shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

67.     The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

68.     Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

69.     This policy is also flawed: due to the very nature of concussions, athletes suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. For example, the types of questions used to screen players for concussions include "What's your name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail to answer them correctly, despite their very elementary nature. Following logically on that, a player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely dependent on others, such as the NCAA, Grand Valley State University, and the University of Toledo, to identify concussive injuries in real-time and take appropriate remedial actions. While Mr. Finnerty played football at the University of Toledo and Grand Valley State University, the NCAA stood in the role of guardian, tasked with making decisions in his best interest. The NCAA failed to fulfill that role and instead acted in its own self-interest, to Mr. Finnerty's detriment.

70.     In the end, the NCAA implemented these (still deficient) policies far too late for

Mr. Finnerty.

## FACTS SPECIFIC TO CULLEN FINNERTY

71.    Mr. Finnerty played football at the University of Toledo in 2001 and Grand Valley State University, from 2002–2006. At the University of Toledo, Mr. Finnerty was a red-shirt freshman, and at Grand Valley Statue University, Mr. Finnerty was the starting quarterback. During his playing career, Mr. Finnerty participated in dozens of football games, as well as hundreds of practices and scrimmages.

72.    While playing football at the University of Toledo and Grand Valley State University, Mr. Finnerty was knocked unconscious and sustained multiple concussions and/or sub concussive impacts to the head during games and/or practice.

73.    Since the inception of the football programs at University of Toledo and Grand Valley State University, through at least 2010, there were no adequate concussion management protocols or policies in place to address and treat concussions sustained by Mr. Finnerty and others during practices and in games.

74.    As a Senior at Grand Valley State University Mr. Finnerty became the winningest quarterback in NCAA All-Division history, with a record of 51-4. That season he was named to the American Football Coaches Association All America Team.

75.    After college, Mr. Finnerty's mental and physical health appeared to remain relatively normal, as he began his career as a medical device salesman.

76.    Things soon began to change. Mr. Finnerty began to suffer from paranoia, fatigue, and forgetfulness.

77.    One weekend, Mr. Finnerty had went fishing on a river in Lake County, and was to be picked up later.

78.     While on the river, Mr. Finnerty became confused and anxious, calling his wife stating that he was being followed by two men and was getting out of the water.

79.     This call was unfortunately reminiscent of an earlier incident he had. Mr. Finnerty was out with co-workers in Detroit, Michigan when he began to believe he was being followed. In a bout of paranoia, Mr. Finnerty drove 150 miles to his brother's house. When he arrived, there was nobody behind him.

80.     Nonetheless, Mr. Finnerty's brother-in-law and father-in-law arrived to pick up Mr. Finnerty at a pre-arranged pickup location on his fishing trip, but he never arrived.

81.     Three days later, Mr. Finnerty was found deceased in the woods, with no evidence of trauma. He was 30 years old.

82.     An autopsy was performed, and determined that Mr. Finnerty died of pneumonia, most likely from the aspiration of gastric contents complicated by Oxycodone toxicity and CTE. Mr. Finnerty had been prescribed Oxycodone as a result of chronic back pain in January of 2013. Both CTE and prescription oxycodone put Mr. Finnerty at a higher than normal risk for aspiration.

83.     Mr. Finnerty's brain was studied at the Center for the Study of Traumatic Encephalopathy at Boston University by Dr. Anne McKee, and was diagnosed with Stage II/IV CTE.

## FIRST CAUSE OF ACTION
## NEGLIGENCE – WRONGFUL DEATH

84.     Plaintiff incorporates by reference the foregoing allegations.

85.     From its inception and by virtue of its role as the governing body of college athletics, the NCAA has historically assumed a duty to protect the health and safety of all athletes at member institutions, including Mr. Finnerty. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including

promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its athletes.

86.     The duties of the NCAA included an obligation to supervise, regulate, and monitor the rules of the University of Toledo and Grand Valley State University football programs and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to football players at the University of Toledo and Grand Valley State University, including Mr. Finnerty.

87.     The NCAA had a duty to educate University of Toledo and Grand Valley State University football players on the proper ways to evaluate and treat TBI during football games and practices, including repetitive concussive and sub-concussive injury. The NCAA's duties further included a duty to warn its athletes of the dangers of concussive and sub-concussive injuries and of the risks associated with football before, during, and after they played college football, and as additional information came to light.

88.     The NCAA had a duty not to conceal material information from University of Toledo and Grand Valley State University football players, including Mr. Finnerty.

89.     The NCAA breached its duties owed to Mr. Finnerty by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in the locker room, and in the weeks and months after they sustained TBIs, as well as providing treatment for the latent effects of TBIs. These failings included, but are not limited to:

        (a)     failing to recognize and monitor concussive and sub-concussive injury during football practices and games;

        (b)     failing to inform student football players of the dangers of

concussive and sub-concussive injuries;

(c)    failing to implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

(d)    failing to implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;

(e)    failing to inform the families of student football players who sustained concussive and/or sub-concussive injuries; and

(f)    failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time student football players left the University of Toledo and Grand Valley State University.

90.    The NCAA breached its duties to student football players, including Mr. Finnerty, by failing to disclose and/or failing to recognize and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Mr. Finnerty.

91.    The NCAA breached its duties to student football players, including Mr. Finnerty, by fraudulently concealing or failing to disclose and/or failing to recognize, and/or being willfully blind to: (a) material information regarding the long-term risks and effects of repetitive head trauma the possessed, or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to student football players.

92.    As a football player at the University of Toledo, Mr. Finnerty relied upon the

guidance, expertise, and instruction of the NCAA in understanding risks associated with the serious and life-altering concussive and sub-concussive hits in football.

93.     As a football player at Grand Valley State University, Mr. Finnerty relied upon the guidance, expertise, and instruction of the NCAA in understanding risks associated with the serious and life-altering concussive and sub-concussive hits in football.

94.     At all times, the NCAA had superior knowledge of material information regarding the effect of repeated traumatic head injuries. Because such information was not readily available to football players at the University of Toledo or Grand Valley State University, including Mr. Finnerty, the NCAA knew or should have known that they would act and rely upon its guidance, expertise, and instruction on these crucial medical issues while attending these universities, and thereafter.

95.     Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

96.     In addition, repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions, especially at an early age.

97.     Mr. Finnerty experienced repetitive concussive and sub-concussive impacts during his college football career, which significantly increased his risk of developing neurodegenerative

disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

98.     The repetitive head accelerations and hits to which Mr. Finnerty was exposed presented risks of latent and long-term debilitating chronic illnesses. Absent the NCAA's negligence and concealment, the risk of harm to Mr. Finnerty would have been materially decreased, and Mr. Finnerty would not have sustained debilitating mental health issues and died.

99.     Thus, as a direct and proximate result of the NCAA's negligence, Mr. Finnerty sustained serious injuries and death.

100.    As a result of its negligence, the NCAA is liable to Plaintiff for the full measure of damages and other relief allowed under applicable law.

### SECOND CAUSE OF ACTION
### NEGLIGENCE – SURVIVAL ACTION

101.    Plaintiff incorporates by reference the foregoing allegations.

102.    From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of its athletes, including Mr. Finnerty. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and to provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its athletes.

103.    The duties of the NCAA included an obligation to supervise, regulate, and monitor the rules of the football programs at the University of Toledo and Grand Valley State University and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to University of Toledo and Grand Valley State University football

players, including Mr. Finnerty.

104.    The NCAA had a duty to educate football players at the University of Toledo and

Grand Valley State university on the proper ways to evaluate and treat TBI during football games

and practices, including repetitive concussive and sub-concussive injury. The NCAA's duties

further included a duty to warn its athletes of the dangers of concussive and sub-concussive injuries

and of the risks associated with football before, during, and after they played college football, and

as additional information came to light.

105.    The NCAA had a duty not to conceal material information from football players at

the University of Toledo and Grand Valley State University, including Mr. Finnerty.

106.    The NCAA breached its duties owed to Mr. Finnerty by failing to implement,

promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and

treatment of TBIs on the playing field, in the locker room, and in the weeks and months after they

sustained TBIs, as well as providing treatment for the latent effects of TBIs. These failings

included, but are not limited to:

> (a)    failing to recognize and monitor concussive and sub-concussive injury during football practices and games;
>
> (b)    failing to inform student football players of the dangers of concussive and sub-concussive injuries;
>
> (c)    failing to implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;
>
> (d)    failing to implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;
>
> (e)    failing to inform the families of student football players who sustained concussive and/or sub-concussive injuries; and

(f)     failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time student football players left the University of Toledo or Grand Valley State University.

107.    The NCAA breached its duties to Mr. Finnerty, by failing to disclose and/or failing to recognize and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Mr. Finnerty.

108.    As a football player at the University of Toledo and Grand Valley State University, Mr. Finnerty relied upon the guidance, expertise, and instruction of the NCAA in understanding risks associated with the serious and life-altering concussive and sub-concussive hits in football.

109.    At all times, the NCAA had superior knowledge of material information regarding the effect of repeated traumatic head injuries. Because such information was not readily available to football players at the University of Toledo and Grand Valley State University, including Mr. Finnerty, the NCAA knew or should have known that they would act and rely upon its guidance, expertise, and instruction on these crucial medical issues while attending these universities.

110.    Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as punch drunk syndrome studied and reported by Harrison Martland in 1928.

111.    In addition, repetitive concussive and sub-concussive blows to the head can

significantly increase a person's risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions, especially at an early age.

112.    Mr. Finnerty experienced repetitive concussive and sub-concussive impacts during his college football career, which significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

113.    The repetitive head accelerations and hits to which Mr. Finnerty was exposed presented risks of latent and long-term debilitating chronic illnesses. Absent the NCAA's negligence and concealment, the risk of harm to Mr. Finnerty would have been materially decreased, and Mr. Finnerty would not have sustained debilitating mental health issues and died.

114.    Thus, as a direct and proximate result of the NCAA's negligence, Mr. Finnerty incurred damages in the form of permanent brain damage, emotional distress, medical costs, health care, secondary care, other out-of-pocket expenses, lost time, lost earnings, and other damages.

115.    As a result of its negligence, the NCAA is liable to Plaintiff for the full measure of damages and other relief allowed under applicable law.

**THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**

116.    Plaintiff incorporates by reference the foregoing allegations.

117.    As a football player at the University of Toledo and Grand Valley State University, both of which are governed by the NCAA, Mr. Finnerty and other football players were required to, and did, enter into contracts with the NCAA as a prerequisite to sports participation. The contract required Mr. Finnerty to complete a form affirming that he had read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution,

27

Operating Bylaws, and Administrative Bylaws, and further, that he agreed to abide by Division Bylaws.

118.    In exchange for Mr. Finnerty's agreement, the NCAA promised to perform certain services and functions, including, amongst other things:

      (a)    conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational wellbeing of NCAA athletes;

      (b)    requiring that each member institution protect the health of, and provide a safe environment for, each of its participating athletes;

      (c)    requiring that each member institution establish and maintain an environment in which the NCAA athletes' activities are conducted as an integral part of the athletes' educational experience.

119.    By signing and agreeing to abide by NCAA rules and regulations, and thereafter participating in NCAA-sanctioned sports programs in accordance with said rules and regulations, Mr. Finnerty fulfilled his contractual obligations to the NCAA.

120.    As described in the foregoing allegations, the NCAA breached its contractual agreement by failing to ensure Mr. Finnerty was provided a safe environment in which to participate in collegiate football. The NCAA further breached its contractual agreement by concealing and/or failing to properly educate and warn Mr. Finnerty about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

121.    Mr. Finnerty entered into a written agreement with the NCAA in which he committed to play football at the University of Toledo, to attend the University of Toledo as a student, and to comply with all codes of conduct and obligations as both a football player and student at the University of Toledo.

122.    Likewise, Mr. Finnerty entered into a written agreement with the NCAA in which

he committed to play football at Grand Valley State University, to attend Grand Valley State University as a student, and to comply with all codes of conduct and obligations as both a football player and student at Grand Valley State University.

123.    Mr. Finnerty fulfilled his contractual obligations to the NCAA.

124.    The NCAA's contractual breached caused Mr. Finnerty to suffer physical injury and damages in the form of, *inter alia*, past medical expenses, lost time, lost earnings, and other damages.

125.    As a result of its misconduct, the NCAA is liable to Plaintiff for the full measure of damages and other relief allowed under applicable law.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT

126.    Plaintiff incorporates by reference the foregoing allegations.

127.    To the extent that an express written contract cannot be established between the NCAA and Mr. Finnerty, the facts set forth above support the finding of an implied contract.

128.    Under the implied contract, NCAA athletes, including Mr. Finnerty, agreed to be bound by NCAA rules and regulations in exchange for their participation in NCAA-controlled athletic programs, including the University of Toledo and Grand Valley State University football programs. As a condition of the implied contract, the NCAA agreed to abide by the promises set forth in its own Constitution and Bylaws, as described above.

129.    Mr. Finnerty indicated his acceptance of the contract, and further, fully performed under the contract, by participating in the University of Toledo football program in accordance with NCAA rules and regulations.

130.    Likewise Mr. Finnerty indicated his acceptance of the contract, and further, fully performed under the contract, by participating in the Grand Valley State University football

program in accordance with NCAA rules and regulations.

131.    The NCAA breached its implied contractual duties by failing to ensure Mr. Finnerty was provided with a safe environment in which to participate in football activities. The NCAA further breached its contract by concealing and/or failing to properly educate and warn Mr. Finnerty about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

132.    The NCAA's breaches caused Mr. Finnerty to suffer physical injury and damages in the form of, *inter alia*, past medical expenses, other out-of-pocket expenses, lost time, lost earnings, and other damages, including death.

133.    As a result of its misconduct, the NCAA is liable to Plaintiff for the full measure of damages and other relief allowed under applicable law.

### FIFTH CAUSE OF ACTION
### BREACH OF EXPRESS CONTRACT – THIRD PARTY BENEFICIARY

134.    Plaintiff incorporates by reference the foregoing allegations.

135.    To the extent no express or implied contract is found to exist between Mr. Finnerty and the NCAA, an express contract existed between the NCAA and the University of Toledo.

136.    Under the terms of that contract, the University of Toledo agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

137.    Under the terms of that contract, as set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, the NCAA and the University of Toledo agreed to, amongst other things: (1) conduct intercollegiate athletic programs in a manner designed to protect and enhance the physical and educational well-being of student athletes, including Mr. Finnerty; and (2) protect the health of and provide a safe environment for each of its participating

athletes, including Mr. Finnerty.

138.    Likewise, To the extent no express or implied contract is found to exist between Mr. Finnerty and the NCAA, an express contract existed between the NCAA and Grand Valley State University.

139.    Under the terms of that contract, Grand Valley State University agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

140.    Under the terms of that contract, as set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, the NCAA and Grand Valley State University agreed to, amongst other things: (1) conduct intercollegiate athletic programs in a manner designed to protect and enhance the physical and educational well-being of student athletes, including Mr. Finnerty; and (2) protect the health of and provide a safe environment for each of its participating athletes, including Mr. Finnerty.

141.    Mr. Finnerty was an intended third-party beneficiary of the contract between the NCAA and the University of Toledo, as well as the contract between Grand Valley State University and the NCAA. Such an intention can be found in the express language of the NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA organization.

142.    The NCAA breached the contractual duties owed to Mr. Finnerty under that contract by: (1) failing to implement or require rules of play and return to play criteria to minimize or prevent the risk of concussions and concussion-related injuries to them; and (2) failing to adequately inform and educate him on the symptoms and long-term dangers of concussions and concussion-related injuries.

143.    The NCAA's breach caused Mr. Finnerty to suffer physical injury and damages in

the form of, *inter alia*, past medical expenses, other out-of-pocket expenses, lost time, lost future earnings, and other damages, including death.

144.    As a result of its misconduct, the NCAA is liable to Plaintiff for the full measure of damages and other relief allowed under applicable law.

**SIXTH CAUSE OF ACTION**
**RESTITUTION**
**(In the Alternative to Breach of Contract)**

145.    Plaintiff incorporates by reference the foregoing allegations, excluding Paragraphs 82–142.

146.    The NCAA receives, and during Mr. Finnerty's participation on the University of Toledo football team, received, significant revenues from the collegiate football played by its athletes. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

147.    The NCAA receives, and during Mr. Finnerty's participation on the Grand Valley State University football team, received, significant revenues from the collegiate football played by its athletes. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

148.    The NCAA appreciates and has knowledge of such benefits.

149.    Under principles of equity and good conscience, the NCAA should not be permitted to retain the profits received at the expense of Plaintiff, while refusing to pay for medical and other expenses incurred as a result of its unlawful misconduct or otherwise failing to prevent such injuries.

150.    Plaintiff seeks restitution and/or disgorgement of all monies the NCAA has unjustly received as a result of its misconduct alleged herein.

## SEVENTH CAUSE OF ACTION
## FRAUDULENT CONCEAMENT

151.    Plaintiff incorporates by reference the foregoing allegations.

152.    The NCAA knew that repetitive head impacts in football game and full-contact practices created a risk of harm to student-athletes that was similar or identical to the risk boxers' faced when receiving repetitive impacts to the head during boxing practices and matches, and professional football players, many of whom were forced to retire from professional football because of head injuries.

153.    The NCAA was aware of and understood the significance of the published medical literature described in the preceding paragraphs of this Complaint, which detailed the serious risk of short-term and long-term brain injury associated with repetitive traumatic impact to the head to which student football players, including Mr. Finnerty, were exposed.

154.    The NCAA was willfully blind to and/or knowingly concealed from Finnerty the risks of TBI in NCAA football games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

155.    Through concealment and affirmative misrepresentation or material facts, the NCAA intended to induce a false belief, under circumstances creating a duty to speak. Defendant intended to induce a false belief that student football players, including Mr. Finnerty, should continue to play football and should not be prevented from playing football after a concussion, or several concussions that should have required time to heal.

156.    Student football players, including Mr. Finnerty, could not have reasonably been expected to know or discover the truth about the risks associated with sub-concussive or concussive injuries, or were prevented or mislead from obtaining such truthful information.  Mr.

Finnerty was under the care and treatment of the NCAA and justifiably relied on its silence, and representations, as representing facts that did not exist.

157. Given the NCAA's superior and unique vantage point, Mr. Finnerty reasonably looked to the NCAA for guidance on head injuries and concussions, including the later-in-life consequences of the repetitive head impacts sustained during football games and practices and the University of Toledo and Grand Valley State University.

158. The concealed information was such that Mr. Finnerty would have acted differently had he been aware of the material facts known to, concealed, and misrepresented by the NCAA. Had Mr. Finnerty known the full facts in the NCAA's possession, he would: (i) not have continued to play after an injury; (ii) have taken additional time to allow brain injuries to heal before returning to play; (iii) have taken additional precautions while playing football; or (iv) not have continued to play college football at all. Despite the NCAA's knowledge, it failed to act reasonably by developing appropriate guidelines or rules regarding return to play criteria and other safety procedures. The NCAA's inaction, concealment, and misrepresentations, increased the risk of long-term injury and illness in student football players, including Mr. Finnerty.

159. As a direct and proximate result of the NCAA's knowing concealment, willful blindness, and affirmative misrepresentations, Mr. Finnerty was prevented from knowing the true risks associated with his decision to play football, and the true cause of his injuries.

160. As a direct and proximate result of the NCAA's knowing concealment, willful blindness, and affirmative misrepresentations, Mr. Finnerty incurred damages in the form of permanent brain damage, emotional distress, medical costs, health care, secondary care, other out-of-pocket expenses, lost time, lost earnings, death and other damages.

161. As a result of their misconduct, the NCAA is liable to Plaintiff for the full measure

of damages allowed under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jennifer Finnerty, individually and as Personal Representative of the Estate of Cullen Finnerty, respectfully requests that the Court enter an Order providing for the following relief:

A.      Declare that Defendant's actions, as set out above, constitute negligence, breach of contract, and fraudulent concealment;

B.      Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendant's conduct, including without limitation damages for past medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, death, and other damages;

C.      Award Plaintiff restitution and/or disgorgement of all monies Defendant has unjustly received as a result of its misconduct alleged herein;

D.      Award Plaintiff reasonable litigation expenses and attorneys' fees;

E.      Award Plaintiff pre- and post-judgment interest, to the extent allowable;

F.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff; and

G.      Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**JENNIFER FINNERTY**, individually, and as Personal Representative of the Estate of Cullen Finnerty,

Dated: August 27, 2018

By: */s/Robert T. Dassow*
Robert Dassow (#15145-64)
rdassow@hovdelaw.com
William F. Eckhart (#32575-49)
beckhart@hovdelaw.com
Tyler Zipes (#35081-49)
tzipes@hovdelaw.com
HOVDE DASSOW & DEETS, LLC
10201 North Illinois Street, Suite 500
Indianapolis, Indiana 46290
Tel: 317.818.3100
Fax: 317.818.3111

Rafey S. Balabanian*
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Jeff Raizner*
efile@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9099
Fax: 713.554.9098

*Counsel for Plaintiff*

**Pro hac vice* admission to be sought.